IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JACQUES AURELUS, | : | |
|     Petitioner | : | |
| | : | |
|     v. | : | No. 02-CV-04517-SD |
| | : | |
| KENNETH J. ELWOOD, | : | |
| DISTRICT DIRECTOR, | : | |
|     Respondent[1] | : | |
| | : | |
| | : | |

GOVERNMENT'S RESPONSE TO PETITION
FOR WRIT OF HABEAS CORPUS

I. INTRODUCTION

This is an alien habeas corpus case challenging detention. The petitioner, Jacques Aurelus, is a native and citizen of Haiti through birth there, probably in May 1962.[2] He entered the country surreptitiously in about 1980, having arrived by boat. Aurelus obtained legal permanent resident

---

[1] Mr. Elwood is the district director of the Immigration & Naturalization Service (INS) and was when the petition was filed. He is substituted for the named respondent pursuant to Fed.R.Civ.P. 25(d).

[2] Aurelus uses multiple aliases, social security numbers, and dates of birth. They are pertinent to his petition only in that they relate to the Immigration Judge's assessing his risk of flight/likelihood to appear for removal.

status in about 1989, apparently by making a claim under the 1986 amnesty laws.

Starting in 1986, Aurelus sustained a series of minor arrests in New Jersey, mostly resulting from assaults upon his housemate. On March 14, 1998 he was arrested and charged with aggravated assault, having beaten his paramour with a table leg. On November 11, 1999 he pleaded guilty to the charge in Essex County Superior Court (New Jersey), and was placed on probation for three years.

According to Aurelus, sometime in 1992 he met a stranger on the street in Newark, New Jersey, and paid him for a United States passport. The passport was validly issued, but under false pretenses; it contains Aurelus' photograph and identifying data, but was issued to "Gregory Carter," born in Newark, New Jersey. The passport recorded that his mother was born in Newark as well. After paying the stranger and providing him with photographs, Aurelus received the passport in the mail. (This information is contained in Aurelus' presentence investigation report.)

Sometime in September 2000, Aurelus went to Canada to visit his brother. On October 1, 2000, he returned to the United States on a charter bus, and was inspected by U.S.

Immigration Officers at Champlain, New York. Aurelus presented the false passport to the inspectors at his "primary" inspection; because the information in the passport about birth in Newark was incongruous with Aurelus' Haitian accent, he was referred to "secondary" inspection. At "secondary" Aurelus/Carter attributed his accent to his mother, apparently forgetting that she was Newark-born as well. A search of "Carter" revealed clues to his true identity. Aurelus was fingerprinted and the government's automated indices promptly identified him as a Haitian alien with an aggravated assault conviction.

Aurelus was presented to the U.S. Magistrate Judge at Rouse's Point, New York on a passport violation charge. Thereafter he was indicted, and in December 2000 pleaded guilty to misuse of a passport, in violation of 18 U.S.C. § 1543. On April 18, 2001 Aurelus was sentenced to imprisonment for six months in the United States District Court for the Northern District of New York at Syracuse.

In addition to presenting Aurelus for prosecution on the passport charge, the INS officers prepared a "Notice To Appear" or "NTA" in Aurelus' case. An NTA is the charging document in removal proceedings. The NTA alleged that

Aurelus was an "inadmissible" alien based on his aggravated assault conviction. Because aggravated assault is a "crime involving moral turpitude," the conviction renders him inadmissible; see 8 U.S.C. § 1182(a)(2)(A)(i)(I).

Because of the short federal sentence, the government started Aurelus's removal case when he was released from the Bureau of Prison's custody. In conjunction with the removal case, the INS detained him and transferred him to its facility at the York County Prison.

On November 20, 2001 Immigration Judge (IJ) John Gossart conducted a custody hearing in Aurelus' case, at the York facility. In a written order, Judge Gossart decided that he lacked jurisdiction over the claim because of "Matter of Collado," of which more anon. Matter of Collado-Munoz, Int. Dec. 3333, 21 I.& N. Dec. 1061, 1997 WL 805604 (BIA 1997). Judge Gossart's bond sheet is appended as exhibit 1.

On February 6, 2002 Aurelus was accorded a "merits" hearing on the issue of his inadmissibility. Immigration Judge Walter Durling found Aurelus subject to removal, but granted petitioner's application for

"cancellation" of removal; see 8 U.S.C. § 122b(a).[3]

      The INS appealed the grant of cancellation to the Board of Immigration Appeals (BIA), asserting that it was an abuse of discretion. The INS will file its brief with the BIA by September 30, 2002. (Absent a remand, removal proceedings are "final" when the BIA has resolved the appeal in favor of the alien or the government.)

      Judge Durling then considered bail for Aurelus, apparently disagreeing with Judge Gossart about the continuing validity of Matter of Collado-Munoz. In a detailed bond memorandum dated April 4, 2002, Judge Durling determined that Aurelus should be released on a bond in the amount of $15,000. Judge Durling's bond papers are appended as Exhibit 2.

      That same day INS appealed the bond decision to the BIA, seeking an emergency "stay" of Aurelus' release. The BIA granted the stay the next day, April 5, 2002.

      On July 5, 2002 Aurelus filed the instant habeas petition with this Court. In it, Aurelus claims that he is

---

[3] Removal may be "canceled" by the IJ if the alien has seven years' permanent residence and has not been convicted of an "aggravated felony" as defined in 8 U.S.C. § 1101(a)(43). Aurelus appears to be statutorily eligible for cancellation.

unlawfully detained under 8 U.S.C. § 1226(c), which provides for mandatory detention for criminal inadmissible aliens.

For the reasons that follow, the government argues that the petition fails to state a claim of illegality, and should be dismissed.

II. ARGUMENT

This case is in a complicated procedural posture, and some background analysis is in order.

We begin at the beginning. This Court has subject-matter jurisdiction to entertain a habeas petition from an alien who challenges his detention and is in the district when the petition is filed. 28 U.S.C. § 2241(c)(3)("...in custody in violation of the law...or Constitution of the United States").

Aurelus is a lawful permanent resident alien ("LPRA") and remains one until his removal order is final. 8 U.S.C. § 1101(a)(20); Katsis v. INS, 997 F.2d 1067, 1070 (3d Cir. 1993). Normally, an LPRA may depart and reenter the United States for a brief or casual trip without being subject to the "admissibility" section of the Immigration & Nationality Act (INA), 8 U.S.C. § 1182(a). There is a salient exception; a permanent resident who has been

convicted of an offense which renders him inadmissible under 8 U.S.C. § 1182(a)(2) (in this case a "crime involving moral turpitude"), is an "arriving" alien who is inadmissible; 8 U.S.C. § 1101(a)(13)(C)(v). See Ferreras v. Ashcroft, 160 F.Supp.2d 617, 623-24 (S.D.N.Y. 2001). It is not relevant that the offense of conviction did not render Aurelus subject to deportation at the time he was convicted. "Admissibility" and "deportability" are discrete concepts, and not always congruent, easily reconciled, or easily understood.[4]

---

[4] As enacted in 1952, the INA was clear and explicit; an alien, even a long-time resident, made an "entry" and was subject to "exclusion" every time he came from a foreign port or place. Congress assumed that any long-term resident who did not want to run the risk of excludability could simply naturalize. The Supreme Court purported to find an exception to this unambiguous scheme by announcing the "Fleuti" doctrine in 1963; Rosenberg v. Fleuti, 374 U.S. 449 (1963). The Fleuti Doctrine held that a permanent resident who departs for a "brief, casual, and innocent trip" to another country is subject to the exclusion laws upon reentry. There followed much litigation as to what constituted "brief," what kind of departure was "casual," etc.  In the 1996 amendments to the INA, Congress negated Fleuti to the extent that § 1101(a)(13)(C)(v) excludes permanent aliens like Aurelus without regard to the nature, length or purpose of their foreign visit. Aurelus told the probation officer that his visit to Canada was for one week, to visit his brother; Fleuti applied to

The detention of inadmissible aliens is controlled in the first instance by 8 U.S.C. § 1225(b)(2). That section says that an "applicant for admission" (an arriving alien) who appears to be inadmissible "shall be detained for a proceeding under section 1229a of this title..." see 8 CFR § 235.3(c)(alien "may be detained" pending hearing). The mandate for detention is qualified; while the inadmissible alien may not post a bond and go on his way, the Attorney General may "parole" the alien into the United States under 8 U.S.C. § 1182(d)(5) if certain conditions are present.[5]

---

that situation prior to its abrogation.

[5] The "parole" section provides in pertinent part that:
 The Attorney General may ... in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.
8 U.S.C.A. § 1182(d)(5)(A) (West 1999 & Supp. 2001).

 By regulation, the Attorney General has delegated this authority to District

Section 1225(b)(2) and the regulations are the basis for the BIA's decision in Matter of Collado-Munoz. In sum, the BIA's Collado decision holds that the inadmissible alien's remedy cannot be release on bond, as a matter of law; rather, the alien must apply to the district director for parole under § 1182(d)(5). See Ferreras v. Ashcroft, *supra*, 160 F.Supp.2d at 623-24. That is the reason Immigration Judge Gossart declined to consider Aurelus' release on bond.

Finally, Section 1226(c)(1) of Title 8 provides that the Attorney General "shall take into custody any alien who...(A) is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title;...." In terms, § 1226(c)(1)(A) applies to Aurelus, who is inadmissible under § 1182(a)(2)(B)(i)(I), having been convicted of a crime involving moral turpitude.

The Attorney General in other forums has argued that § 1225(b)(2)(A) is sufficient to detain inadmissible aliens without reference to § 1226(c)(1)(A), and that any constitutional infirmities in the mandatory detention

---

Directors and other specified INS officials.
8 CFR § 212.5 (2001).

statute at 8 U.S.C. § 1226(c) thus do not pertain. This position has found some support in the courts; see Ferreras, *supra*; Piskulick v. Ashcroft, 2002 WL 1880704, *1 (N.D.Ill. Aug. 15, 2002).[6]

Under this theory, § 1225(b)(2)(A) mandates detention of an inadmissible alien subject to the Attorney General's parole discretion, but if the alien is a criminal, parole is precluded by § 1226(c)(1). This interpretation has the effect of giving effect to both § 1225(b)(2)(A) and § 1226(c)(1)(A). Otherwise, if § 1225(b)(2)(A) mandated detention for all inadmissible aliens, the language in § 1226(c)(1) mandating detention for the subset of

---

[6] The distinction between detention of "admitted" aliens and detention of those not admitted received reinforcement last Summer by the Supreme Court in Zadvydas v. Davis, 533 U.S. 678 (2001), albeit in the context of detention following a final order. The Zadvydas Court confirmed that "excludable/inadmissible" aliens seeking entry have no Constitutional right to be at large in this country, and may be detained indefinitely. Zadvydas, 121 S.Ct. at 2500-02 (due process rights of detained aliens turn on the distinction between aliens who have "gained entry" and those applying for admission, which distinction "runs throughout immigration law," and noting that Fifth Amendment due process still has minimal or no application to aliens seeking admission or otherwise outside the borders; reaffirming Shaughnessy v. U.S. ex rel. Mezei, 345 U.S. 206 (1953)).

inadmissible aliens who are criminals would be redundant surplusage.

The Court need not resolve this question of statutory interpretation, nor need it resolve any thorny Constitutional issues to dispose of this petition. Aurelus contends, correctly, that the Third Circuit has decided that mandatory detention under § 1226(c) violates the Constitution, at least in the case of a lawful permanent resident like him, unless the alien is afforded an individualized custody determination. Patel v. Zemski, 275 F.3d 299 (3d Cir. 2001). Patel remains the law of the circuit until the Supreme Court decides the issue next term.[7] Whether Patel applies to inadmissible aliens subject to detention under § 1225(b)(2) can remain an open question

---

[7] See United States v. Radoncic, 28 Fed.Appx. 113, 2001 WL 1681643 (3d Cir. Jan. 4, 2001), petition for cert. filed, 70 U.S.L.W. 3642 (U.S. April 4, 2002) (No. 01-1459); Kim v. Ziglar, 276 F.3d 523 (9th Cir.2002) (holding that mandatory detention under § 1226(c) is unconstitutional as applied to lawful permanent resident alien), cert. granted sub nom., 70 U.S.L.W. 3655 (U.S. June 28, 2002) (No. 01-1491); Hoang v. Comfort, 282 F.3d 1247 (10th Cir. 2002) (same), petition for cert. filed, 70 U.S.L.W. 3698 (U.S. May 3, 2002) (No. 01-1616). Radoncic was argued to the Third Circuit the same day as Patel.

so far as this petition is concerned.[8]

Where Aurelus errs is in arguing that his detention offends Patel v. Zemski. In Aurelus' case, Immigration Judge Durling determined that an appropriate bond is $15,000. While perhaps a little high in the routine case, Judge Durling doubtless considered Aurelus' multiple aliases, dates of birth, and social security numbers, and his misuse of a U.S. passport. Moreover, Judge Durling decided bond in this amount <u>after</u> he granted Aurelus cancellation of removal.

Judge Durling's bond decision is the individualized custody determination mandated by Patel. Because that determination has been made in this case, Patel has no application. Notwithstanding the BIA's stay of release, so long as Patel is valid the Attorney General will release Aurelus upon posting of the bond in the amount of $15,000, as determined by the Immigration Judge.

---

[8] Immigration Judge Durling has held that the Patel decision trumps the mandatory detention provisions in §1225(b)(2), and further that Patel mandates a bond consideration despite the statute and the parole regulations precluding release on bond for inadmissibles. This is why Judge Durling's determination is at variance with Judge Gossart, and possibly with the BIA itself. As set forth *infra*, the Court need not address the issue.

-12-

The government notes that Judge Durling's discretionary decisions relating to the bond, its amount, the factors contributing to it, etc. are not reviewable on habeas. 8 U.S.C. § 1226(e).

III. CONCLUSION

Because Aurelus has had an individualized custody determination, his habeas petition fails to state a claim of illegality and must be denied.

Respectfully,

PATRICK L. MEEHAN
United States Attorney

_____
JAMES G. SHEEHAN
Assistant United States Attorney
Chief, Civil Division

_____
STEPHEN J. BRITT
Assistant United States Attorney